[No. D039615. Fourth Dist., Div. One. Jan. 14, 2003.]

SAVE OUR NTC, INC., Plaintiff and Appellant, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

## COUNSEL

Haskins & Associates, Steven W. Haskins, Margaret L. Coates, Cyrus Seradj, Shad Cavoulas and Kris Jacobs for Plaintiff and Appellant.

Casey Gwinn, City Attorney, Anita M. Noone, Assistant City Attorney, and John P. Mullen, Deputy City Attorney, for Defendant and Respondent City of San Diego.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, and Hayley Peterson, Deputy Attorney General, for Defendant and Respondent California Coastal Commission.

Gray, Cary, Ware & Freidenrich, Mark C. Zebrowski and Mary A. Lehman for Defendant and Respondent McMillin-NTC, LLC.

## OPINION

**McINTYRE, J.**—Save Our NTC, Inc. (SONTC) filed a petition for writ of mandamus and a complaint for declaratory and injunctive relief against the

City of San Diego (the City), the California Coastal Commission (the Commission), McMillin-NTC, LLC and others. SONTC seeks to enforce a zoning ordinance created pursuant to a 1972 voter initiative known as Proposition D against property that was previously operated by the United States Navy as a naval training center but that has been transferred to the City for private development (the NTC property). The main question in this case is whether the application of Proposition D, which pursuant to the supremacy clause of the United States Constitution was inapplicable to federally owned property, became mandatory as to the NTC property once the federal government transferred the property to the City. We answer this question in the negative and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The City electorate's adoption of Proposition D created a "coastal height limit overlay zone" to which a 30-foot height limitation on new construction applied. The initiative, which was codified as San Diego Municipal Code section 132.0505, defined the overlay zone as "that land and water area of the City . . . from the northern City limits south to the border of the Republic of Mexico, extending seaward to the outer limit of City jurisdiction and extending inland to the location of Interstate 5 on January 1, 1971" but excluding "that land area . . . bounded by National City on the south, San Diego Bay on the west and Laurel Street or the southwesterly projection of Laurel Street on the north." The ordinance also provided "[n]otwithstanding any section to the contrary, there shall be no exception to the provisions of this ordinance." (San Diego Mun. Code, § 132.0505, subd. (d); see also, *id.*, § 132.0505, subd. (a).)

The United States Constitution gives Congress exclusive legislative jurisdiction over military bases located on property acquired by the federal government with the consent of the state in which the property is located. (U.S. Const., art. I., § 8, cl. 17.) At the time Proposition D was adopted, Congress held such sovereign rights to the NTC property and thus Proposition D's 30-foot height limitation was inapplicable to the property, which currently has approximately 200 existing structures, 81 of which are taller than 30 feet, 21 of which exceed 40 feet and the tallest of which is 48 feet in height.

In 1993, a commission established under the federal Defense Base Closure and Realignment Act of 1990 (10 U.S.C. § 2687) (the Federal Base Closure Act) recommended the closure of several military bases, including the naval training center. The commission's recommendation was accepted by Congress and signed by President Clinton. The Defense Department, which

was responsible for consulting with "affected local governments" before adopting a reuse plan and disposing of property at the NTC site that was surplus to the federal government's needs (the surplus NTC property), designated the City as the local redevelopment authority for the surplus NTC property. (*City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 682 [74 Cal.Rptr.2d 497], citing Pub.L. No. 101-510 § 2905(b)(2)(D) (Nov. 5, 1990) 104 Stat. 1814, set forth as subsequently amended as Note foll. 10 U.S.C. § 2687.) The City, as redevelopment authority, was in turn responsible for identifying local reuse needs and creating a redevelopment plan for the Defense Department's consideration. (See 32 C.F.R. §§ 176.5, 176.20(a) (2002); U.S. Dept. of Defense, Community Guide to Base Reuse, <http://www.acq.osd.mil/installation/reinvest/sect_2.html> [as of Jan. 14, 2003].)

In late 1993, the City created a 26-member NTC Reuse Planning Committee to make recommendations to the city council for development of the surplus NTC property, which consisted of 429 of the NTC site's 550 acres. An October 1994 report prepared for the reuse planning committee on existing conditions and considerations affecting redevelopment planning indicated the City's view that Proposition D would not apply to any surplus NTC property transferred to the City because the initiative specifically exempted any land that was owned by the federal government on January 2, 1971.

The reuse planning committee held public meetings and solicited community input for two years before issuing its recommendations for the property redevelopment. The city planning commission and the city council conducted additional public hearings on the proposed plan and, in October 1996, the City approved a draft NTC reuse plan for review by the Defense Department and the Department of Housing and Urban Development (HUD). The draft plan envisioned multiple uses of the parcel, including historic, educational, recreational, residential, commercial and hotel uses, and described the development as including 350 housing units with front stoops of "up to 36 [feet] high," a 350-room vacation hotel and 650-room "mid-rise" business hotel.

HUD approved the draft reuse plan in June 1997 and the Navy and the City prepared a joint environmental impact statement and environmental impact report (the EIS/EIR) for the proposed project. The final EIS/EIR, which was issued in August 1998, acknowledged that a portion of the surplus NTC property would be subject to Proposition D upon transfer to the City, but indicated "[a]ll of the proposed uses for the [redevelopment project] can be accommodated within the 30-foot height limit area," thus negating any adverse impacts from the project.

In October 1998, the City certified the final EIS/EIR and adopted the final reuse plan for the surplus NTC property. The final Reuse Plan incorporated the draft plan's intent to develop a 350-room family hotel, a mid- to high-rise business hotel with 650 rooms and single-family residences of up to 36 feet on the surplus NTC property. In March 1999, the Defense Department issued a record of decision, finding that the final reuse plan was consistent with federal standards for redevelopment of surplus military property, approving the final reuse plan and announcing its decision to dispose of the surplus NTC property "in a manner . . . consistent with the [final] Reuse Plan."

In May 2000, the City authorized the city manager to accept transfer of the surplus NTC property and shortly thereafter it entered into an agreement with McMillin-NTC to develop the property in accordance with the reuse plan. Pursuant to the development agreement, the City, in its capacity as the local redevelopment authority, agreed to sell and lease portions of the surplus NTC property to McMillin-NTC, LLC, which in turn agreed to invest $116.3 million to develop the property in accordance with the reuse plan.

In October 2000, the City certified a mitigated negative declaration for the redevelopment project, declaring the surplus NTC property exempt from Proposition D because the federal government owned it on January 2, 1971, and specifying that the heights of new construction on the surplus NTC property would be determined from application of "proposed underlying zones." It also adopted Ordinance No. 0-18871, which set forth new base zoning for the redevelopment site that, if certified by the Commission, would allow residences of up to 35 feet high and commercial structures of up to 100 feet high. At the same time, it amended two overlay zone ordinances to apply to the NTC property transferred to the City and approved a substantial amendment to its local coastal program to carry out the proposed redevelopment. The City did not amend the Proposition D ordinance to include the surplus NTC property, nor did it include a 30-foot height limitation as part of its local coastal program amendment.

After the United States deeded the property to the City, the City sought approval from the Commission for its local coastal program amendment and the implementing ordinances, as necessary to carry out the project. In June 2001, the Commission denied the City's land use plan and implementation ordinances as submitted, but approved those items conditioned on certain modifications, including a height limitation on buildings in the office and research and development area of the site (to 45 feet, subject to one exception for a 58-foot building) and a height limitation of 36 feet for

residential areas. In July, the City adopted the proposed modifications. The Commission confirmed its certification of the local coastal program amendment the following September.

SONTC filed this action in October 2001 and sought an ex parte temporary restraining order. The court denied the ex parte request, but set a hearing on the petition for writ relief and motion for preliminary injunction. After the hearing, the court denied the writ petition and SONTC's request for injunctive relief on the grounds that (1) Proposition D did not apply to the site because the property was not within the jurisdiction of the City on January 1, 1971; (2) SONTC's petition was an untimely challenge to the City base zoning ordinance; and (3) SONTC's claims were barred by the doctrine of laches.

SONTC appeals, contending that the court erred in finding that (1) its writ petition was untimely, (2) its claims were barred by the doctrine of laches, and (3) Proposition D was inapplicable to the NTC property transferred to the City. It also contends that the court's interpretation of the initiative effectively amended or repealed Proposition D without the approval of the electorate. We conclude that, although SONTC's action was timely in accordance with the statute of limitations, the trial court correctly concluded that Proposition D does not apply to the property and, on that basis, we affirm the judgment. We do not reach the issue of whether SONTC was guilty of laches.

DISCUSSION

1. *Statute of Limitations*

Government Code section 65009, subdivision (c)(1)(B) sets forth a 90-day statute of limitations for bringing an action or proceeding "[t]o attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance." (All statutory references are to the Government Code unless otherwise specified.) The expansive language of the statute is intended to foreclose challenges to the facial validity of land use decisions unless such challenges are promptly brought, in order "to provide certainty for property owners and local governments regarding [local zoning and planning decisions]." (§ 65009, subd. (a)(3); *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22 [32 Cal.Rptr.2d 244, 876 P.2d 1043]; *Gonzalez v. County of Tulare* (1998) 65 Cal.App.4th 777, 786 [76 Cal.Rptr.2d 707].)

SONTC argues that section 65009, subdivision (c)(1) does not apply to this action because it is not challenging a local decision adopting or

amending a zoning ordinance, but rather attacking the City's failure to apply Proposition D to the surplus NTC property. However, in arguing that Proposition D applies to the surplus property, SONTC also challenges the City's zoning decisions relating to the redevelopment site that were inconsistent with Proposition D. SONTC contends that this is not so because Proposition D is an "overlay zone" that applies in addition to, rather than instead of, the underlying zoning designations. However, under the circumstances presented, SONTC's argument is unavailing. Prior to the adoption of the new base zoning ordinances, the City developed the reuse plan, which called for the construction of structures in excess of the Proposition D height limitation and certified its mitigated negative declaration stating that Proposition D was inapplicable to the property. Thereafter, the City specifically adopted a new base zoning ordinance for the surplus NTC property that allowed building in excess of the height limitation and did not amend the Proposition D ordinance to incorporate the surplus NTC property upon transfer from the federal government, as it did with other overlay zoning ordinances. It is these decisions relating to the zoning of the surplus NTC property that provide the basis for this action.

SONTC also argues that, even if section 65009, subdivision (c)(1) applies, its action was timely filed. It contends that although the City adopted these zoning ordinances in October 2000, its decisions were not final, and thus not subject to challenge, because the ordinances were conditioned on certification by the Commission as local coastal program amendments.

SONTC's argument is well taken. Although the language of section 65009, subdivision (c)(1) specifies that an action challenging a legislative zoning decision must be commenced "within 90 days *after the legislative body's decision*" (italics added), the California Supreme Court has indicated that the statutory limitations period does not begin to run until the ordinance's effective date. (*Hensler v. City of Glendale, supra,* 8 Cal.4th at p. 22; *Howard Jarvis Taxpayers Assn. v. City of Los Angeles* (2000) 79 Cal.App.4th 242, 247 [93 Cal.Rptr.2d 742]; cf. *Beresford Neighborhood Assn. v. City of San Mateo* (1989) 207 Cal.App.3d 1180, 1187 [255 Cal.Rptr. 434] [rejecting an argument that the statute of limitations began to run on the date the ordinance was introduced to the city council and holding that the accrual date was the date of adoption].)

Here, the implementing ordinances provided that they would take effect when the Commission "effectively certifie[d]" the ordinances and proposed plan amendments as local coastal program amendments. The ordinances also provided that if not certified, or if certified with suggested modifications, by the Commission, their provisions "shall be null and void." (SONTC does not

challenge the viability of the ordinances as a result of the Commission's initial conditional certification thereof and thus we do not address that issue here.) In accordance with their express terms, the zoning ordinances relating to the surplus NTC property did not take effect any earlier than July 17, 2001, when the City adopted the modifications the Commission required as a condition of its approval of the local coastal program amendments and the implementing ordinances. The statute of limitations on SONTC's claims did not accrue prior to that time and thus the filing of this action on October 9, 2001 was timely.

## 2. *Applicability of Proposition D's Height Limitation to the Surplus NTC Property*

■ The threshold issue in this case is whether Proposition D became applicable to the surplus NTC property once the United States government transferred it to the City. SONTC argues that, in accordance with the language of Proposition D and the intent of the electorate in adopting it, the height limitation applies to the property. The City and McMillin respond that, in accordance with controlling federal and state law, Proposition D does not apply to the property, irrespective of the voters' intent. We agree with the latter argument.

■ Congress has "exclusive legislative jurisdiction" over military bases where the State has consented to federal acquisition. (U.S. Const., art. I, § 8, cl. 17.) The state's voluntary cession of property to the federal government without conditions is an actual transfer of sovereignty, relieving the state and local legislative bodies of authority to enact legislation affecting the property. (*S. R. A., Inc. v. Minnesota* (1946) 327 U.S. 558, 562 [66 S.Ct. 749, 752-753, 90 L.Ed. 851] ["[e]xclusive legislative power is in essence complete sovereignty"]; *Taylor v. Lockheed Martin Corp.* (2000) 78 Cal.App.4th 472, 481 [92 Cal.Rptr.2d 873].) Exclusive jurisdiction once acquired by the United States over federal areas remains except as modified by statute. (U.S. Const., art. I, § 8, cl. 17; *Surplus Trading Co. v. Cook* (1930) 281 U.S. 647, 651-652 [50 S.Ct. 455, 456-457, 74 L.Ed. 1091]; *Howard v. Commissioners* (1953) 344 U.S. 624 [73 S.Ct. 465, 97 L.Ed. 617].)

■ The Federal Base Closure Act establishes the comprehensive statutory scheme governing the closure, transfer and reuse of the surplus military properties. In accordance with the act and the regulations promulgated thereunder, the Defense Department designates a local redevelopment authority to develop a comprehensive reuse plan for the surplus base property. (32 C.F.R. § 176.20(a) (2002).) Based on solicitation and consideration of input from the community, the local redevelopment authority determines the

primary goals for base reuse and works closely with the Defense Department to develop a plan that deals with all issues relating to base reuse, including environmental considerations, natural resource concerns and cultural and historical requirements. (32 C.F.R. § 176.20(b) (2002); U.S. Dept. of Defense, Community Guide to Base Reuse <http://www.acq.osd.mil/installation/reinvest/sect_2.html> [as of Jan. 14, 2003]; *id.*, <http://www.acq.osd.mil/installation/reinvest/sect_3.html> [as of Jan. 14, 2003]; *id.*, <http://www.acq.osd.mil/installation/reinvest/sect_4.html> [as of Jan. 14, 2003].) Development of a preferred reuse plan involves a consideration of existing local housing and development regulations and plans, but is not strictly limited by such regulations and plans. (See 32 C.F.R. §§ 175.7(d)(2), 176.30(b)(4)(ii), 176.32(b)(2)(ii) (2002).)

The local redevelopment authority submits a proposed reuse plan for evaluation by the Defense Department, which completes an environmental impact analysis of the proposed plan and reasonable alternative uses for the property and determines whether the preferred plan constitutes the "highest and best use" of the property. (32 C.F.R. §§ 176.30(b)(4)(ii), 176.32(b)(2)(ii) (2002); see generally 41 C.F.R. pt. 101-47 (2002).) HUD also reviews the plan for assessment of whether the plan adequately balances local community and economic development needs with the needs of the homeless. (U.S. Dept. of Defense, Community Guide to Base Reuse <http://www.acq.osd.mil/installation/reinvest/sect_2.html> [as of Jan. 14, 2003]; *id.*, <http://www.acq.osd.mil/installation/reinvest/sect_3.html> [as of Jan. 14, 2003]; *id.*, <http://www.acq.osd.mil/installation/reinvest/sect_4.html> [as of Jan. 14, 2003].) Transfer of the property occurs only if the Defense Department and HUD determine that the proposed plan meets the Federal Base Closure Act's criteria for disposal of the property. (Note foll. 10 U.S.C. § 2687, Pub.L. No. 101-510, § 2905(b)(7), subpar. (A) et seq. (Nov. 5, 1990) 104 Stat. 1814) Upon such approval, "[l]ocal comprehensive plans and zoning must also be updated and adapted to reflect the redevelopment plan." (U.S. Dept. of Defense, Community Guide to Base Reuse <http://www.acq.osd.mil/installation/reinvest/sect_4.html> [as of Jan. 14, 2003].) Thus, in accordance with the federal statutory and regulatory scheme, the determination of the appropriate use for base property is made pursuant to federal criteria and is not necessarily limited by existing local zoning ordinances.

Further, contrary to SONTC's assertion, state laws enacted to facilitate the conversion of closed military bases to civilian use are consistent with the federal statutory scheme in this regard. The California Government Code

identifies the City as the local base reuse authority for the surplus NTC property (§ 65050), thus establishing the City as the sole state authority for purposes of reuse planning for, and transfer of, the surplus NTC property. (§§ 65060, subds. (c), (d), 65051.) The state statutes do not include any express provision regarding the impact of local zoning ordinances on reuse planning, except to say that "[i]t is not the intent of the Legislature in enacting this section [establishing local base reuse entities] to preempt local planning efforts . . . ." (§ 65050, subd. (b).)

Pursuant to the federal and state statutory schemes governing reuse planning and transfer of military base properties, the federal government's transfer of the surplus NTC property to the City did not trigger the application of all existing zoning ordinances to the property, but instead only those that were consistent with the reuse plan approved by the Defense Department and HUD. As SONTC readily admits, the Proposition D height limitation is not consistent with the reuse plan; accordingly, the limitation did not apply to the base property, regardless of whether the voters would have intended for it to apply to property acquired by the City after its adoption.

### 3. *Implied Repeal of Proposition D*

SONTC argues that the City's failure to apply Proposition D to the NTC property is tantamount to a repeal of the ordinance in violation of Elections Code section 9217, which provides in relevant part "[n]o ordinance that is . . . adopted by the voters . . . shall be repealed or amended except by a vote of the people, unless provision is otherwise made in the original ordinance." (See also San Diego Mun. Code, § 27.1049.) However, Proposition D did not apply to the NTC property at the time of its adoption nor did it become applicable as a result of the federal government's transfer of the property to the City. Thus, nothing in the trial court's determination constituted an effective repeal of Proposition D, in whole or in part, and hence no violation of Elections Code section 9217 is established.

### 4. *Conclusion*

For the reasons set forth above, we conclude that the height limitation imposed by Proposition D does not apply to the surplus NTC property and we affirm the trial court's entry of judgment in favor of the respondents on that basis. Based on this determination, we do not reach the respondents' argument that this action is barred by the doctrine of laches or SONTC's argument, raised for the first time in its appellate reply brief and not supported by the allegations of its writ petition in the proceedings below, challenging the adequacy of the Commission's review of the City's local coastal program.

### DISPOSITION

The judgment is affirmed. The respondents are entitled to their costs on appeal.

Nares, Acting P. J., and McConnell, J., concurred.

A petition for a rehearing was denied February 10, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 9, 2003.