Filed 4/3/14  Scholars Academic Foundation v. City of Glendale CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| SCHOLARS ACADEMIC FOUNDATION, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF GLENDALE, <br><br> Defendant and Appellant. | B243799 <br><br> (Los Angeles County <br> Super. Ct. No. EC052590) |


        APPEAL from a judgment of the Superior Court of Los Angeles County, David S. Milton, Judge.  Reversed.

        Michael J. Garcia, City Attorney, and Ann M. Maurer for Defendant and Appellant.

        Law Offices of Vip Bhola and Vip Bhola; Law Offices of Richard M. Foster, Richard M. Foster and Christina Malyan for Plaintiff and Appellant.

Scholars Academic Foundation, Inc. (the school) sued the City of Glendale (City) after the City "yellow tagged" the school's building for violations of the Glendale Building and Safety Code.[1]  As here relevant, the school alleged two causes of action:  inverse condemnation and violation of due process.  In a bench trial, the trial court found that the City's action constituted a permanent taking of the school's property for which compensation was required.  The City appeals, raising several challenges to the trial court's findings.  The school cross-appeals, contending that the trial court erred in awarding it $135,000 instead of $2.7 million in damages.  On two independent grounds, we reverse the judgment:  (1) the school failed to exhaust its administrative remedies, and (2) the City's actions did not constitute a taking.  We therefore reverse the judgment and dismiss the school's cross-appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

*Requirement of a Conditional Use Permit*

On January 22, 2010, the school entered into a lease of property at 3800-3810 Foothill Boulevard.  The lease was signed by Anna Grigoryan, the school principal, and Artur Danielyan, the school secretary.[2]  Grigoryan hired Mike Geragos, a general contractor and member of the City's Design Review Board, to prepare an application for a conditional use permit from the City.

---

[1]  "Yellow tagging" is the phrase commonly used to describe the process by which the City declares a building unsafe to occupy.  Volume 5, Sections 1101 to 1104.2 of the Glendale Building and Safety Code "give[] the Glendale Building Official the authority to post a 'Notice to Vacate' any building declared to be substandard."

[2]  Danielyan is also described in the record as the school Vice Principal.

2

In January 2010, Edith Fuentes, the City's zoning administrator, met with Grigoryan and Geragos. Fuentes told them that a conditional use permit application was required for the school, which required a formal hearing.[3] Nonetheless, according to Grigoryan, Fuentes gave the school permission to move in and begin operating during the pendency of its application for the conditional use permit. According to Fuentes, she did not have the authority to grant permission to operate without a proper permit or zoning use certificate. Rather, she gave the school permission to move in boxes, but not to begin operating, consistent with the City's occasional past practice of allowing a business to move into a location while applying for a conditional use permit.

*The School Opens Without Permits*

In January 2010, the school began operating a private school for students from kindergarten through high school at the location, although it had not yet obtained permits from the City. On January 27, 2010, the City's Neighborhood Services Inspector, Thomas Soler, received a report from the Glendale Police Department that a new school had moved into the building at 3800 Foothill without a zoning use certificate or conditional use permit and with no pending application for either. Soler verified that the area was a C-3 zone and learned that there was no application for either a zoning use certificate or conditional use permit at the time.

Soler visited the property and told Danielyan that the school needed to obtain a zoning use certificate and conditional use permit. Danielyan said that the

---

[3] Glendale School District had previously operated a school at the location, but was not required to obtain permits from the city. At trial, a 1999 letter by Glendale's City Attorney was admitted into evidence, which stated that the City was precluded by California Supreme Court case law from enforcing local building and safety codes, including permits, against the school district.

documents were being prepared and would be submitted shortly. On January 29, 2010, Soler sent a 15-day letter to the school, stating that "it was operating and maintaining a private educational institution in a C-3 zone without proper use permits and without a proper zoning use certificate." By February 16, 2010, the school still had not filed any documents for a zoning use certificate or conditional use permit. Soler spoke again with Danielyan, who stated that they were in the process of submitting the paperwork.

*The School Performs Non-Permitted Construction*

On February 11, 2010, Ronald Billing, a senior building inspector with the Glendale Building and Safety Division, observed children playing in a subterranean garage at the school. Having observed construction workers at the site, he asked a woman inside if there was construction taking place, and she said that there was. Because the workers were working without a permit, Billing gave the woman a B-13 form, or "Stop Work Order."

On February 17, 2010, Billing sent a code violation letter to the building owner. The letter notified the owner that construction work – the erection of a wall "to divide one unit into two separate spaces (including building and electrical)"— was being done without permits or an inspection, in violation of Appendix Chapter 1 Section 105.1 of Volume I of the Glendale Building and Safety Code (Building Code). The notice gave the owner 30 days to obtain the necessary permits and begin corrective action. If construction was performed without obtaining the necessary permits, building permit fees were subject to being doubled.

Shortly after sending the letter to the building owner, Billing learned from Jan Edwards, Glendale's Deputy Building Official, that the last legal occupancy designation of the school's building was a "Group B occupancy," which is for

4

office space.  However, under the Building Code , a private school required a "Group E occupancy" designation.  According to Billing, the Glendale Unified School District might well have operated a school in the building as a Group E occupancy, but approvals and inspections for public schools were performed by a state agency, not the City.  Moreover, as Billing noted, "by performing unauthorized/unpermitted interior alterations to the building, one or the other entity had changed the building to some unknown state beyond what the state had approved for use as a public school."

*Inspection of the School*

On February 24, 2010, Billing inspected the school with Jeffrey D. Halpert, Fire Marshal of the Glendale Fire Department, and Gregory Ahern, an inspector with the Glendale Fire Department.  They took pictures of the conditions that constituted code violations, and Halpert prepared a report of the violations dated March 18, 2010.  According to the fire inspection report:  "Alterations were made to the building without benefit of permits (specifically, . . . one [rear] exit door was sealed-in-place);  [¶]  The fire alarm system was out-of-service. . . . ;  [¶]  Some areas were not properly protected by fire sprinklers (due to the unpermitted construction, some sprinklers were too far from or close to a wall);  [¶]  Desks and other items were being stored within hallways, causing an obstruction and posing a hazard. . . . ;  [¶]  One [rear] exit door had been sealed-in-place;  [¶]  The exit doors were equipped with hardware inappropriate for a school ('storefront' type doors, with double-key deadbolts).  Almost all of the exit doors were locked except for one – the entry;  [¶]  There were approximately 70 students total, with only four total toilets available.  [¶]  . . .  [¶]  A subterranean parking garage is now being

5

used as both a playground and for storage of combustible materials.  The storage is extremely dense and piled high."

At trial, Halpert summarized the safety violations as follows:  "We saw that all of the exits in the building were locked except for one that was an entry.  The exit doors did not have the right hardware for a school. . . .  [¶]  The hardware that was in that building, that's typical of a business or an office-type use.  But for a school, the code requires that the hardware be what we call panic hardware.  And none of the doors in that building had the panic hardware."[4]  In addition, some of the doors did not open outward in order to allow quick egress in the event of a fire.  Halpert also stated that the fire alarm system "was completely out of service."  The exit doors were locked, in violation of the code, and illegal construction in the building had resulted in the sprinkler system failing to protect all areas of the building.

*The Decision to Yellow Tag*

Because of the seriousness of the violations, the City held a meeting to decide on a course of action, attended by representatives of the Building and Safety Department, the Code Enforcement Department, the City Attorney's Office, and the Fire Department.  The participants concluded that the violations were so severe that it would be unsafe for anyone to occupy the building.  They therefore decided

---

[4]    Halpert explained that panic hardware "is a type of unlatching device on a door that . . . if there's a crowd or a panic, it doesn't require someone to manually manipulate like a lever or doorknob."

to yellow tag the building, prohibiting any occupancy or use of the building except for personnel involved in making repairs or retrieving property.[5]

On February 24, 2010, around 5:00 p.m., Halpert, Ahern, Billing, and Soler went to the school to place yellow tags. They met with Danielyan, Geragos and Grigoryan for approximately an hour and explained the safety issues discovered by the inspection. They then yellow tagged the school and left around 7:00 p.m.

---

[5] The requirements for a notice to vacate from the building official are found in Section 1101 of the 1997 Uniform Housing Code, which was adopted as Volume V of the Glendale Building and Safety Code. (City of Glendale Ordinance No. 5581, found at http://www.ci.glendale.ca.us/gmc/Ordinance5581.pdf.) The code provides as follows: "1101.1 Commencement of Proceedings. When the building official has inspected or caused to be inspected a building and has found and determined that such building is a substandard building, the building official shall commence proceedings to cause the repair, rehabilitation, vacation or demolition of the building. [¶] 1101.2 Notice and Order. The building official shall issue a notice and order directed to the record owner of the building. The notice and order shall contain the following: [¶] 1. The street address and a legal description sufficient for identification of the premises upon which the building is located. [¶] 2. A statement that the building official has found the building to be substandard, with a brief and concise description of the conditions found to render the building dangerous under the provisions of Section 202 of this code. [¶] 3. A statement of the action required to be taken as determined by the building official."

Billing cited Volume V, Sections 1101-1104.2 of the Glendale Building and Safety Code as the authority for the yellow tagging. In its brief, the City cites California Building Code section 115.3. The language of these two provisions is slightly different. Section 115.3 states: "If an unsafe condition is found, the building official shall serve on the owner, agent or person in control of the structure, a written notice that describes the condition deemed unsafe and specifies the required repairs or improvements to be made to abate the unsafe condition, or that requires the unsafe structure to be demolished within a stipulated time. Such notice shall require the person thus notified to declare immediately to the building official acceptance or rejection of the terms of the order." (California Building Code, § 115.3 (2007), found at http://publicecodes.cyberregs.com/st/ca/st/b200v07/st_ca_st_b200v07_app1_sec015.htm)

*The School Reopens*

Ani Zeneian, a teacher at the school, testified that the school was closed after the yellow tagging for approximately six weeks, until the school obtained a temporary restraining order allowing it to reopen. During the six weeks that the building was closed, the school relocated to a banquet hall. Zeneian estimated that the school lost approximately one-half of its original 150 students as a result of the yellow tagging and the relocation.[6]

*Follow-up Code Violation Notice*

On February 25, 2010, the City sent a letter to the building owner, entitled "Code Compliance Follow-Up Notice, Additional Violations Noted." This notice included additional violations for failure to obtain the proper permits as well as the violations discovered during inspections by the Fire Department and the Building and Safety Department. The letters sent to the school did not specify the code sections that had been violated. Nonetheless, Soler said that he believed that the school was sufficiently apprised of the needed repairs, based on the discussion held by the inspectors with Geragos and Grigoryan.[7]

---

[6]     The school's enrollment records indicate that the school had 158 students in January 2010, 124 students for the period of January 25-30, 2010, 99 students in February 2010, and 59 students in June 2010.

[7]     The February 25, 2010 letter included citations to general code sections, as well as the text of the sections violated. For example, the letter described the first violation as "Unsafe installation and/or maintenance of modifications, alterations to the interior of 3800 Foothill Blvd Unit #A and Unit #B, and 3810 Foothill Blvd to include structure, electrical, plumbing and mechanical modifications, alterations without city approval/permits," in violation of Building and Safety Code section V1.105.1. The letter then set forth the text of the code.
        The letter also indicated that the school violated Glendale Municipal Code sections 30.12.020(B) and 30.46.020 by operating a private educational institution in a

On February 26, 2010, Halpert, Ahern, and Geragos met with Stuart Tom, a building official from the Building and Safety Department, to discuss the possibility of allowing temporary occupancy while permits were obtained. Although the fire department was willing to support a temporary fire permit, the request for a temporary permit needed to be considered by the Building Department and the Planning Department as well. From approximately March 1 to 9, 2010, Geragos met several times with various City officials, but on March 4, Halpert told Geragos that the City Attorney's office had placed a hold on the temporary permit.

After the school hired contractors to make the necessary repairs to the fire sprinkler and fire alarm systems, those systems were inspected and approved by Halpert on March 4 and 5, 2010. Halpert issued a fire alarm permit and a fire sprinkler permit.

*The Lawsuit*

On April 1, 2010, the school filed the instant civil action against the City in the superior court. On April 5, 2010, the superior court granted the school's motion for a temporary restraining order and ordered that the school be allowed to continue operating at the location pending a hearing on the motion for a preliminary injunction. The City removed the action to federal district court, which transferred the case back to the superior court in July 2010.

---

C3 zone without obtaining a conditional use permit and a zoning use certificate, and set forth the relevant sections of the code. (See Glendale Municipal Code, §§ 30.12.020, 30.46.020, found at http://www.ci.glendale.ca.us /gmc/30.aspx.) The letter stated that the Neighborhood Services Inspector will visit the property on March 29, 2010, to determine if the corrections have been made. The letter further instructed the owner to contact the building inspector to obtain further details.

9

Meanwhile, the school did not submit its application for a conditional use permit until April 8, 2010. In an April 19, 2010 letter, the City informed Geragos that the school's check submitted with its applications for a conditional use permit and a parking reduction permit was returned for insufficient funds. Thereafter, pursuant to a resolution passed by the City Council in 2009, providing for fees to be doubled for applications attempting to legalize a cited use, structure or structural alteration, the school's application fees were doubled.[8]

On May 18, 2010, the City sent Geragos another letter, stating that the school's applications for the conditional use permit and the parking reduction permit were still incomplete. The letter set forth 18 specific issues that needed to be addressed or clarified.[9]

On July 9, 2010, the City sent Geragos another letter again stating that the application was incomplete. On July 27, 2010, a City Planner sent an email to Geragos, stating that Geragos did not come as expected to pay the application fees.

---

[8]  According to the school, the City required it to pay more than double in fees. Under the City's 2011-2012 Fee Schedule, the fee for a conditional use permit was $2,750, but the school was required to pay $6,467.50, approximately $967 more than the doubled amount.

[9]  One of the issues discussed in the May 18, 2010 letter was the City's requirement that the school conduct an environmental impact study to support its application for a parking reduction permit. The letter explained that, pursuant to calculations based on formulas set forth in the City Parking Code, Chapter 30.32.050C, the total parking required for the school was 215 parking spaces. (See Glendale Zoning Code, § 30.32.050C, found at http://www.ci.glendale.ca.us/gmc/Zoning_Code/Chapter30-32.pdf.) The school wanted to provide only 22 or 23 parking spaces. The City therefore required the school to conduct an environmental impact study in order to ensure that the reduced number of parking spaces would not have an adverse environmental impact. Timothy Foy, Assistant Director of Community Planning for the City, testified that the California Environmental Quality Act required an environmental impact study when a business applied for a parking reduction permit, although some discretion was involved in deciding whether to impose the requirement.

Because "the fees were not submitted by the agreed upon deadline," the school's applications were deemed rejected. The email explained that if the school wanted to proceed with the permit applications, it needed to submit new applications and pay the requisite fees. The record does not indicate that the school ever submitted a new application.

On July 20, 2010, Halpert, fire inspector Joe Morelly, Billing, and Tom met with Danielyan and the school's counsel at the school. According to Halpert, they thoroughly inspected the building and noted each remaining violation. Some of the violations found on February 24 still existed, such as the lack of panic hardware on exit doors, the failure of self-closing doors in corridors, and the garage being used for both storage and a playground.

Halpert was told by Ann Maurer of the City Attorney's office "that the City Council ordered the City Attorney to go after the school." Thereafter, on September 1, 2010, the City obtained a temporary restraining order enjoining the school from operating without first obtaining "all proper permits and certificates" for the property.

On October 22, 2010, the school filed a first amended complaint, alleging six causes of action: (1) inverse condemnation; (2) violation of due process; (3) conversion; (4) intentional interference with prospective economic relations; (5) negligent interference with existing economic relationships; and (6) intentional interference with existing contracts. The superior court granted the City's motion for judgment on the pleadings as to the third, fourth, fifth, and sixth causes of action, leaving only the claims for inverse condemnation and violation of due process.

11

*The Bench Trial*

In April 2012, the trial court held a bench trial at which the City employees testified to the facts set forth above. In addition, the school presented the testimony of its expert, Byron Foster, a retired fire marshal for the State of California. Foster testified that he inspected the school on March 25, 2010 and reviewed the City's reports, the declarations of City officials, the depositions, and the exhibits. In his opinion, the yellow tagging was unnecessary.

The court issued a statement of decision in which it concluded that "under case law the action taken by the [City] in 'yellow tagging' the building 'went too far' and 'constituted a taking' for which just compensation is required." The City objected to the statement of decision on the basis that it did not explain the factual and legal basis, and asked the court to explain the factual and legal bases for eight controverted issues.

The court subsequently issued a final statement of decision. The court explained that it was the City's "improper and unconstitutional enforcement of reasonable and valid regulations that amounted to a taking." The court found the taking to be permanent, based on the City's "aggregate conduct . . . such as unwarranted 'yellow tagging,' use of intimidating tactics during inspections, such as demanding personal information from the owners/operators/board members, license plate recordation, photographing of vehicles at the location, which the evidence showed was admittedly improper, failure to provide proper notice of violations, refusal to reinspect after notice by [the school] that conditions had been rectified, unexplained refusal to allow [the school to] continue with school operations after city departments agreed that it would be safe and appropriate to do so, unnecessary doubling of fees in some areas, and requiring further discretionary

12

studies in some instances."  The court found that evidence regarding the valuation of school's business was reasonable and awarded the school $135,000.

The court entered judgment in favor of the school and awarded it $135,000. The City filed a notice of appeal, and the school filed a cross-appeal.  This court consolidated the cases for purposes of briefing, oral argument and decision.

## DISCUSSION

### I.  *Ripeness and Exhaustion of Administrative Remedies*

We begin with the City's contention, made in the trial court and urged again on appeal, that the school's action was not ripe, because the school failed to exhaust its administrative remedies.  We agree.

"'[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.' [Citation.]" (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 10.)  "Ripeness . . . is a matter of final administrative adjudication.  The idea of ripeness arises . . . because local authorities should have the chance to change their minds when a local restriction otherwise results in a compensable taking." (*Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1279 (*Avenida San Juan Partnership*).)

For an administrative decision to be ripe for judicial review, the decision must be final, meaning that the school "must proceed through the full administrative process 'to a final decision on the merits.' [Citation.]" (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1489 (*California Water Impact Network*).)  "'"'The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts

should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary).' [Citation.] . . . '"Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.'"' [Citation.]" (*Tejon Real Estate, LLC v. City of Los Angeles* (2014) 223 Cal.App.4th 149, 156.)

'"In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' [Citation.] The rule is a jurisdictional prerequisite in the sense that it 'is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis*, and binding upon all courts.' [Citations.]" (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874.)

In the present case, the evidence is undisputed that the school failed to exhaust its administrative remedies. First, it never completed the initial permit application process. Thus, the City never had occasion to hold a hearing and rule on the whether the school was entitled to the required permits.

Second, section 112 of the Glendale Building and Safety Code contains a specific appeal procedure for decisions made by a City building or fire code official, such as the decision to yellow tag the building. Under this procedure, an appeal of a decision regarding the application and interpretation of the code must be made to the building and fire board of appeals, which must hold a public hearing on the matter. (Glendale Building & Safety Code, §§ 112.1-112.3.4.) A party aggrieved by the decision of the board of appeals may then appeal the

14

decision to the City Council.[10] (Glendale Building & Safety Code, § 112.3.5.) The school failed to avail itself of the appeal process in challenging the City's decision to yellow tag the building. No appeal was taken to the building and fire board of appeals or to the City Council.

In short, the instant lawsuit does not challenge a final administrative decision: there is no final decision denying the school appropriate permits because the school never complied with the permit application process, and there is no final decision regarding yellow tagging the school building because the school did not follow the procedure to appeal that decision. Thus, the school's action against the City is barred, unless an exception to the exhaustion requirement applies.

The trial court did not make an express finding on whether the school was excused from exhausting its administrative remedies. Because the court rendered judgment in the school's favor, we rely on the doctrine of implied findings to infer that the court must have found that the exhaustion requirement was excused. (See *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 [explaining that the doctrine of implied findings "(1) directs the appellate court to presume that the trial court made all factual findings necessary to support the judgment so long as substantial evidence supports those findings and (2) applies unless the omissions and ambiguities in the statement of decision are brought to the attention of the superior court in a timely manner"].)

The school relies on the futility doctrine to excuse the requirement of administrative exhaustion. Under this doctrine, "[t]he failure to pursue administrative remedies does not bar judicial relief where the administrative

---

[10]    "[T]he exhaustion doctrine applies even where the administrative remedy is couched in permissive language. [Citation.]" (*California Water Impact Network*, *supra*, 161 Cal.App.4th at p. 1489.)

15

remedy is inadequate or unavailable, or where it would be futile to pursue the remedy. [Citation.] In order to invoke the futility exception, a plaintiff must show "'that the [agency] has declared what its ruling will be on a particular case.'" [Citation.]" (*Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1430-1431.)

Here, the school relies on the totality of the City's actions as evidencing a certainty, or near certainty, that the City would have denied the appropriate permits even if the administrative process had been followed to completion. However, "'"[f]utility is a narrow exception to the general rule"'" requiring exhaustion of remedies. [Citation.] The exception applies only if the party invoking it can positively state that the administrative agency has declared what its ruling will be in a particular case." (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1313.) An administrative remedy is not inadequate "'merely because additional time and effort would be consumed by its being pursued through the ordinary course of the law.'" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1082 (*Coachella Valley*).) Moreover, a prior adverse administrative ruling or even demonstrated bias is not sufficient to establish the futility exception because an administrative agent "may change his or her mind." (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 620 (*Unnamed Physician*); see *Economic Empowerment Foundation v. Quackenbush* (1997) 57 Cal.App.4th 677, 691 (*Economic Empowerment Foundation*) [claim of insurance commissioner's bias insufficient to establish futility exception, explaining, "that the Commissioner may have treated [the school] and other intervenors unfairly in other proceedings does not establish that he is bound to do so in this one"].)

Fatal to the school's futility argument is the undisputed fact that the school failed to pursue to completion even the first step of its available administrative remedies. It filed no appeal of the decision to yellow tag the school building, and it never completed the initial permit application process. In these circumstances, it cannot be said that the City's actions, even viewed as a whole, constituted a declaration that it would uphold the yellow tagging of the school if the appropriate appeal process had been pursued, resulting in a public hearing and appeal to the City Council, or that it would deny the school's application for a conditional use permit if a completed application were filed and a public hearing were held. Put another way, the failure to complete the permit application and to appeal the yellow tagging decision did not accord the City decision makers "the chance to change their minds" regarding the issues at the heart of the school's claims in this lawsuit. (*Avenida San Juan Partnership*, *supra*, 201 Cal.App.4th at p. 1279.)

We conclude that the trial court erred in its implied finding that the school was not required to exhaust its administrative remedies. Therefore, on this ground alone, the judgment must be reversed.


II.    *Taking under Lucas or Penn Central*

Even if the school was excused from exhaustion, we further conclude that there was no taking.

The City contends that its actions do not constitute a taking under United States Supreme Court precedent. "'Whether the [City's] actions constituted a taking is a mixed question of law and fact. [Citations.] Our review is neither entirely de novo nor entirely limited by the substantial evidence rule. [Citation.] "Mixed questions of law and fact involve three steps: (1) the determination of the historical facts—what happened; (2) selection of the applicable legal principles;

17

and (3) application of those legal principles to the facts.  The first step involves factual questions exclusively for the trial court to determine; these are subject to substantial evidence review; the appellate court must view the evidence in the light most favorable to the judgment and the findings, express or implied, of the trial court.  [Citations.]"  [Citation.]  Thus, we do not apply de novo review to factual findings underlying the trial court's judgment, instead applying the substantial evidence rule.  [Citation.]  Only the second and third steps involve questions of law, which we review de novo.'  [Citation.]"  (*Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 183 (*Lockaway Storage*); see also *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1269 (*Allegretti*) ["Whether there was a compensatory taking is a question of law, and we are not bound by the lower court's interpretation of the evidence presented on the question below."].)

"The state and federal Constitutions guarantee real property owners 'just compensation' when their land is 'taken . . . for public use. . . .'  [Citations.]  The Fifth Amendment's takings clause, made applicable to the states through the Fourteenth Amendment, does not prohibit the taking of private property, but instead places a condition on the exercise of that power.  [Citation.]  'In other words, it "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking."'  [Citation.]

"'The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property.'  [Citation.]  But 'government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and . . . such "regulatory takings" may be compensable under the Fifth Amendment.'

18

[Citation.]  Supreme Court precedents recognize two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. [Citation.]  First, where government requires an owner to suffer a 'permanent physical invasion' of his property—even as minor as cable lines and boxes bolted onto an apartment building's roof and exterior walls—it must provide just compensation.  [Citations.]  'A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial use" of her property.' [Citation.]  '[I]n *Lucas* [*v. South Carolina Coastal Council* (1992) 505 U.S. 1003 (*Lucas*)] [the high court held] that the government must pay just compensation for such "total regulatory takings," except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property.'  [Citation.]  [¶]  Outside these two categories, regulatory takings challenges are governed by the 'essentially ad hoc, factual inquiries' set forth in [*Penn Central Transp. Co. v. City of New York* (1978) 438 U.S. 104 (*Penn Central*)].  [Citations.]"  (*Allegretti*, *supra*, 138 Cal.App.4th at pp. 1269-1270.)

"Whether a regulation goes 'too far' is tested under what has been called the '*Penn Central* factors' approach.  Our own Supreme Court has noted that there are three core factors:  (1) the economic effect on the landowner; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the governmental action.  [Citation.]"  (*Avenida San Juan Partnership*, *supra*, 201 Cal.App.4th at p. 1272.)

The instant case does not involve a direct government appropriation or physical invasion of private property.  Instead, the trial court found that the City's actions in yellow tagging the building "went too far" and thus constituted a taking. The school relies on both the *Lucas* theory that it was denied all economically

19

beneficial use of its property and the *Penn Central* theory that the City's actions "went too far."

*Lucas* requires the imposition of "a regulation that declares 'off-limits' all economically productive or beneficial uses of land." (*Lucas*, *supra*, 505 U.S. at p. 1030.) That is, an owner of real property has suffered a taking when "[he] has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle." (*Id.* at p. 1019; see also *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 330 [explaining that the categorical rule of *Lucas* "would not apply if the diminution in value were 95% instead of 100%," and that "[a]nything less than a 'complete elimination of value,' or a 'total loss,'" would require a *Penn Central* analysis].) That was not the situation here.

There is no evidence that the facility could not have been used for a purpose other than a school. City records indicated that the building was designated for use as an office. Moreover, the school personnel were still able to enter the building to make repairs. Thus, the school was not deprived of all economically beneficial use of the property. (See *Avenida San Juan Partnership*, *supra*, 201 Cal.App.4th at p. 1273 [not a complete taking because there was no substantial evidence the City would not approve any development on the property]; compare *Freeny v. City of San Buenaventura* (2013) 216 Cal.App.4th 1333, 1340 [in determining whether the school has exhausted administrative remedies, "[i]f a plaintiff is claiming that a government entity has effected a regulatory taking by "'den[ying] [her] *all* economically beneficial or productive use . . .'" of her property, denial of a single use or project may not be sufficient. [Citation.] Presentation and rejection of other uses—that is, reexhaustion—may also be necessary to establish that *the property*

20

has no use."].)  The *Lucas* theory accordingly does not apply.  As we explain, neither does the *Penn Central* theory.

"The *Penn Central* inquiry is not a means-ends test; the question is not 'whether a regulation of private property is *effective* in achieving some legitimate public purpose.'  [Citation.]  Instead, the goal is to assess the '*magnitude or character of the burden* a particular regulation imposes upon private property rights' in order to determine whether its effects are 'functionally comparable to government appropriation or invasion of private property.'  [Citation.]" (*Lockaway Storage*, *supra*, 216 Cal.App.4th at p. 185.)  "Although the *Penn Central* factors do not serve as a checklist, a court may dispose of a takings claim on the basis of one or two of them.  [Citations.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 272 (*Shaw*).)

We find the second *Penn Central* factor to be dispositive and therefore focus our discussion there:  the extent to which the regulation has interfered with distinct, investment-backed expectations.  (*Shaw*, *supra*, 170 Cal.App.4th at p. 272.)  "A '"reasonable investment-backed expectation"' must be more than a '"unilateral expectation or an abstract need."'  [Citation.]  Also important in analyzing this factor is the 'nature and extent of permitted development under the regulatory regime vis-à-vis the development sought by the claimant.'  [Citation.]" (*Id.* at p. 273.)

The school contends that the yellow tagging interfered with distinct, investment-backed expectations, arguing that it had entered into a five-year lease, had 158 students, and knew that the City was flexible about allowing businesses to operate while applying for a conditional use permit.  Even construing the facts in the school's favor by, for example, assuming that Fuentes gave the school permission to operate temporarily while it applied for its permits, the fact remains

21

that the school never completed its applications for its permits and yet continued to operate, and never appealed the decision to yellow tag the school. It is not objectively reasonable to expect to be able to operate a private school in the long term (i.e., five years pursuant to the lease) without obtaining the necessary permits from the City or challenging through proper administrative procedures a decision to yellow tag the school. On this ground alone, there was no taking under *Penn Central.* Therefore, the judgment must be reversed.[11]

## DISPOSITION

The judgment is reversed. The City is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.                    MANELLA, J.

---

[11] In light of our conclusion that the trial court erred in finding a taking, we need not address the City's arguments that the statement of decision was inadequate, that substantial evidence does not support the court's factual findings, that the court improperly conflated due process and takings jurisprudence and erred in finding the school's due process rights were violated by the taking, and that the court erred in its award of damages. We also dismiss plaintiff's cross-appeal regarding the amount of the award.